IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                  Case No. 11-10097-JTM

CARL R. KIRKLEY,

    Defendant.

MEMORANDUM AND ORDER

This matter comes before the court on defendant Carl Kirkley's Motion to Suppress (Dkt. No. 41). Defendant filed the motion the day before trial, on August 22, 2011. On August 23, after empaneling the jury, the court held a hearing on the motion. After hearing the evidence and the parties' arguments, the court orally granted the motion. The government promptly moved for a mistrial and filed a Notice of Appeal (Dkt. No. 43) challenging this court's decision to grant the Motion to Suppress. This Memorandum and Order serves to memorialize and explain these oral rulings.

**I. Factual Background**

The facts surrounding this matter are as follows.

Defendant was arrested on May 24, 2011, based on an incident at 1201 N. Sherman, the

1

detailed facts of which are set out in this court's August 12, 2011, Order on defendant's first Motion to Suppress (Dkt. No. 32). Within a short time after arriving at the Harvey County Detention Center, defendant bonded out on the domestic battery charge. Although defendant was initially arrested and booked on a domestic battery charge, Detective Nedrow amended those charges in his May 24, 2011, offense report to include charges involving the gun and methamphetamine paraphernalia found in the defendant's garage. Later that night, defendant was arrested for violating conditions of his bond. Again, he was booked into jail and bonded out.

The next day, May 25, defendant called Nedrow inquiring about the search conducted on his garage the day before. Not wanting to discuss the matter over the phone, Nedrow suggested an in-person meeting. The two agreed to meet at the defendant's mother's house around 1:00 p.m. that afternoon. Nedrow then called Newton Police Department Officer Josh Lowe and asked if he would accompany him to the meeting with defendant. Around 1:00 p.m., Lowe saw defendant walking through a parking lot about a block away from the police station and called Nedrow. Nedrow told Lowe to stop defendant and keep him there so he could come talk to him in the parking lot, believing that location was more conducive to officer safety. Lowe pulled into the parking lot, approached defendant, and talked to him for a couple of minutes. Once Nedrow arrived, he immediately *Mirandized* him, and defendant acknowledged he understood the warnings and agreed to talk. At this point, Nedrow's testimony contains some key inconsistencies. At the first suppression hearing, he testified that he read defendant his *Miranda* rights because he believed he could incriminate himself and that he was not free to go. At the second hearing, Nedrow testified that defendant was free to go at any time and that he never arrested defendant. During the course of the conversation, defendant admitted he traded methamphetamine for the gun found in his garage and that he was trying to

2

produce methamphetamine in the garage for personal use and for sale.

**II. Analysis of Stop**

Defendant filed this Motion to Suppress arguing the May 25, 2011, stop was illegal under the Fourth Amendment and that the conversation between Nedrow and defendant must be suppressed. The government argued at the hearing that the stop was a consensual encounter, or in the alternative, that the stop was valid under *Terry v. Ohio*, 392 U.S. 1 (1968).

The Tenth Circuit recognizes three permissible encounters between police and citizens, each requiring various standards of reasonableness under the Fourth Amendment. *United States v. Kitchell*, —F.3d—, 2011 WL 3452082, at *6 (10th Cir. 2011); *see also Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). First are consensual encounters, which do not implicate the Fourth Amendment. *United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required.") (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Second are investigatory detentions, or *Terry* stops, which "are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity." *United States v. Torres-Guevera*, 147 F.3d 1261, 1264 (10th Cir. 1998) (quoting *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)). Third are custodial arrests that must be supported by probable cause. *Id.* The question in this case is whether Lowe and Nedrow's stop of the defendant constituted a consensual encounter, a valid *Terry* stop, or an impermissible detention in violation of the Fourth Amendment.

*A. Consensual Encounter*

"An encounter is consensual if the defendant 'is free to leave at any time during the encounter.'" *United States v. Esparza-Mendoza*, 386 F.3d 953, 957 (10th Cir. 2004) (quoting *Torres-Guevera*, 147 F.3d at 1264). "Thus, '[p]olice officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures.'" *Id.* at 957-58 (quoting *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004)). The encounter transforms from consensual to a seizure "'when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way.'" *Id.* (quoting *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996)). Factors that may be important in determining whether the encounter was consensual include:

> [T]he location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008) (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). This list is not exhaustive and "no one factor is dispositive." *Id.* (quoting *United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004)). "When viewing the totality of the circumstances, it may be that the strong presence of two or three factors demonstrates that a reasonable person would have believed that he was not free to terminate an encounter with government officials." *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). Another such factor is

the issuance of *Miranda* warnings. *See United States v. Redlightning*, 624 F.3d 1090, 1105 (9th Cir. 2010). However, "'the issuance of *Miranda* warnings as a cautionary measure does not itself transform the situation into a Fourth Amendment seizure.'" *Id.* (quoting WAYNE R. LAFAVE, SEARCH AND SEIZURE § 5.1(a) (4th ed. 2004)).

Here, at Detective Nedrow's request, Officer Lowe stopped defendant in the parking lot and asked him to talk. He then informed defendant that Nedrow wanted to meet with him at the parking lot and that he needed to wait for Nedrow. Lowe and defendant waited for a few minutes until Nedrow arrived. At this point in the stop, defendant had an objective reason to believe he was not free to leave based on Officer Lowe's uncontradicted testimony that he told defendant to wait for Detective Nedrow. The reasonable effect of Lowe's order to wait for Nedrow is that defendant was not free to leave or go about his business. *See Esparza-Mendoza*, 386 F.3d at 957-58. This conclusion is unaffected by the arrangement defendant and Nedrow had to meet at defendant's mother's house later in the day because it is unrelated to defendant's objective belief that he could not leave the parking lot after he was stopped by Officer Lowe. Even though defendant had consented to meet Nedrow at his mother's house later, that does not mean he consented to meeting him in the parking lot, and it certainly does not overcome the objective facts surrounding the stop showing he could have reasonably believed he was not free to go.[1] Thus, from its inception, defendant objectively had reasons to believe he was not free to go, reasons which were bolstered following Nedrow's arrival.

Detective Nedrow testfied, at least initially, that when he arrived he *Mirandized* defendant

---

[1]The testimony relating to the planned meeting between Nedrow and defendant only goes to their subjective beliefs, thus, the impact on the objective facts of the stop is largely irrelevant.

because Kirkley might incriminate himself, and testified further, at least initially, that Kirkley was not free to go. The issuance of *Miranda* warnings in and of themselves are not enough to turn a consensual or noncustodial interrogation into a nonconsensual or custodial one, however, it is one factor the court takes into account when determining the nature of the stop. *See Redlightning*, 624 F.3d at 1105. The *Miranda* warnings given on May 25, objectively support the conclusion that defendant was not free to go. First, Nedrow's subjective belief that defendant was not free to go, while not dispositive, is indicative of the nature of the stop and supports the objective belief that defendant was not free to go. Nedrow's belief makes it likely defendant felt the same way. More importantly, it supports the objective conclusion that defendant was, in fact, not free to go. Officer Lowe's presence at the scene, not more than a few feet from where defendant was questioned, further supports this objective belief. Additionally, neither Lowe nor Nedrow informed defendant at any time during the stop that he was free to leave.

Second, the *Miranda* warnings given on May 25, are more significant because of their proximity to defendant's two previous arrests on May 24. On May 24, defendant was given *Miranda* warnings twice; each time he was arrested, detained, and taken to the Harvey County Detention Center. Defendant objectively could have concluded, based on those two arrests, that the *Miranda* warnings given by Nedrow on May 25, necessarily meant he was not free to leave. Because the court concludes the stop of defendant was not a consensual encounter, the next issue is whether it constituted a valid *Terry* stop.[2]

---

[2]The defendant emphasizes the term or terms Officer Lowe and Detective Nedrow used to describe the stop. Specifically defendant sought admission by Nedrow that he "detained" defendant. The court lays to rest any idea that the specific word or words used to describe the stop affect the analysis of this issue. In fact, the language used is not determinative at all. The word "detained" is a term of art in some respects and not in others. What term was used between Lowe and Nedrow is not important. What is important is what actually took place at the stop.

*B. Terry Stop*

Typically, a *Terry* stop "'involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda*.'" *United States v. Eckhart*, 569 F.3d 1263, 1275-76 (10th Cir. 2009) (quoting *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1992)). "Thus, the officer may question the detainee during the stop in order to dispel or confirm his or her suspicions, but any further detention is elevated to an arrest, unless there is consent." *United States v. Gandarilla-Estrada*, 1998 WL 781040, at *3 (10th Cir. 1998). "*Terry* stops must be limited in scope to the justification for the stop." *Perdue*, 8 F.3d at 1462; *see also Terry*, 392 U.S. at 29; *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). A *Terry* stop must be based, at its inception, on an objectively reasonable and articulable suspicion that the person seized has or is engaged in criminal activity. *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998). For an officer to have a reasonable suspicion to seize an individual, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Woods*, 209 F.3d at 1186 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Whether . . . an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993).

Here, the government has failed to show the stop of defendant was permissible under *Terry*. At its inception, Office Lowe had no objectively reasonable and articulable suspicion that defendant was or had recently been engaged in criminal activity. *See Soto-Cervantes*, 138 F.3d at 1322. In fact,

7

Lowe testified that he only stopped defendant because Nedrow ordered him to do so, and not because he had a reasonable suspicion defendant was engaged in criminal activity. Further, another troubling fact is that Nedrow stopped defendant and interrogated him about topics already known by him and the Newton Police Department at the time defendant bonded out on his two prior arrests on May 24.[3] Like Lowe, Nedrow had no objectively reasonable and articulable suspicion that defendant was or had committed a crime near the time of the stop, thus, the government cannot rely on Nedrow's knowledge of the previous crimes as a valid basis for the stop.

The Seventh Circuit, in similar factual circumstance, held continuing knowledge of a defendant's possible guilt of an offense charged is not sufficient to support the continuing existence of probable cause to re-arrest a defendant previously admitted to bail. *See United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971). In *Holmes*, several defendants were arrested for a drug conspiracy involving heroin on March 5, 1967. *Id.* at 260. On the following day, one of those defendants, James Oliver, was admitted to bail. *Id.* On March 22, Oliver was indicted but remained at large until he was re-arrested on October 18. *Id.* Oliver was re-arrested based on erroneous orders given to arrest new defendants contained in a superseding indictment, of which Oliver was not one. *Id.* During the search of his person officers seized over six thousand dollars. *Id.* Oliver filed a motion to suppress arguing his re-arrest was unconstitutional. *Id.* The government argued the previous charges filed against Oliver provided probable cause for his re-arrest. *Id.* In ruling on the issue the court stated:

> The issue is not resolved so easily. Not only must there be reason to believe that a prospective arrestee is guilty of a crime; in addition, there must be some purpose to be served by making an arrest. During the entire period between March and October

---

[3] Detective Nedrow did testify that he instructed Officer Lowe to stop defendant in the parking lot for officer safety, however, this justification goes only to the location of the stop not the reason for the stop, which is the critical factor under *Terry*.

> 18, 1967, probable cause to believe that Oliver had committed an offense continued to exist because he was under indictment. But since he had been admitted to bail, no purpose could have been served by continually rearresting him. Although at large, in contemplation of the law he remained in custody. In historic terms, he was the prisoner of his bail. The return of the second indictment justified a review of his custodial status. Additional charges might have made a rearrest proper, to be followed either by termination of bail or a modification of its conditions. In Oliver's case, however, when the second indictment was returned, the judge ordered no change in his custodial status. The subsequent arrest, therefore, had no greater purpose than if there had been no second indictment. *We recognize that a variety of valid causes for a rearrest of a person admitted to bail may exist*, see Carlson v. Landon, 342 U.S. 524, 546-547, 72 S. Ct. 525, 96 L.Ed. 547, *but certainly the continuing knowledge of his possible guilt of the offense charged in the indictment is not itself sufficient*; otherwise, harassment by continual rearrests could be justified by the continuing existence of "probable cause." The Fourth Amendment requires both a reasonable foundation for a charge of crime and also the avoidance of "rash and unreasonable interferences with privacy." Since there was no valid justification for Oliver's arrest, we conclude that the search of his person on October 18, 1967, was prohibited by the Fourth Amendment, and the seized cash was inadmissible. *Beck v. Ohio*, 379 U.S. 89, 85 S. Ct. 223, 13 L.Ed.2d 142; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 473-484, 91 S. Ct. 2022, 29 L.Ed.2d 564.

*Id.* at 260-61 (emphasis added) (internal footnotes omitted).

Here, Nedrow testified he ordered Lowe to stop defendant so he could continue his investigation regarding the drug charges. On direct examination Nedrow testified defendant had not been arrested and released on bail regarding the drug charges. However, on cross examination he conceded that his May 24, offense report on defendant included the drug offenses. It is clear the interrogation involved topics already known to Nedrow at the time defendant bonded out on his two previous arrests. There was no new information to justify stopping defendant in the parking lot and no reasonable suspicion to support the stop. Like the court in *Holmes*, this court holds the continuing knowledge of defendant's guilt of the drug offenses was not sufficient, by itself, to support the existence of reasonable suspicion for the stop. *See* 452 F.2d at 260-61. Thus, because neither Lowe nor Nedrow had any valid basis for the stop at its inception, or any further knowledge supporting

9

reasonable suspicion beyond what they already knew, the stop and continued questioning of defendant constituted an impermissible *Terry* stop.[4]

In sum, there was nothing suspicious about what defendant was doing at the time of the stop—walking through a parking lot. Moreover, neither Officer Lowe nor Detective Nedrow had any reason to suspect defendant committed or was in the process of committing a crime. Any indicia of a consensual encounter ended when Nedrow *Mirandized* defendant and proceeded to interrogate him about crimes for which he had been arrested the day before. Because the officers lacked reasonable suspicion to question defendant and the further questioning exceeded the bounds of a consensual encounter and constituted an impermissible *Terry* stop, all statements made by defendant during the interrogation must be suppressed.

### C. Purging the Taint

The government failed to show the stop was either a consensual encounter or a valid *Terry* stop. Therefore, the statements made by defendant must be suppressed unless the government proved the subsequent incriminating statements were not fruit of the illegal stop, but rather were obtained

---

[4]Defendant cites *United States v. Peters*, 10 F.3d 1517 (10th Cir. 1993), to support his argument that there was no basis for the stop. In *Peters*, defendants, who were driving a moving van, were stopped on the highway for weaving into the left lane. *Id.* at 1519. The officer checked defendants' licenses and ran a computer check and found no irregularities. *Id.* Because defendants appeared nervous, the officer requested consent to search the vehicle, which was granted. *Id.* Finding nothing illegal during the search, the officer told defendants they were free to go. *Id.* Immediately thereafter, the officer informed his superior the stop "didn't feel good" because the defendants were nervous. *Id.* The Lieutenant informed the Albuquerque Drug Enforcement Administration, and defendants were once again stopped. *Id.* at 1520. The reason for the second stop was based entirely on the first officer's bad feeling. *Id.* During the second stop, the DEA agent learned the defendants were illegal aliens and arrested them and searched the truck finding illegal immigration documents. *Id.* The court held that the second stop violated the Fourth Amendment because it was based upon the same reasons provided by the first officer and which had proved illusory. *Id.* at 1522-23. Although not directly on point with this case, *Peters* does hold that reasonable suspicion for an investigatory detention must exist at the time of the stop and cannot be based solely on conduct previously dispelled by an earlier stop. *Id.*

by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). In *Brown v. Illinois*, the Supreme Court identified four factors relevant when determining whether statements made to police after an illegal seizure are admissible: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the statements and the Fourth Amendment violation; (3) the existence of intervening causes between the violation and the statements; and (4) the purpose or flagrancy of the official misconduct. 422 U.S. 590, 603-04 (1975).

Taken together, the factors weigh decidedly against the government. Although Nedrow did give defendant *Miranda* warnings, the statements occurred a few minutes after the illegal stop. Additionally, there were no intervening circumstances. Last, while the court does not find the officers' conduct was grossly flagrant, it is clear neither Nedrow nor Lowe believed they had reasonable suspicion to conduct the stop. Therefore, the court finds the statements were the product of the illegal stop and were not purged of the primary taint.

### III. Mistrial

"When a mistrial has been declared, the Double Jeopardy Clause precludes a retrial of the defendant unless the defendant consented to the mistrial, or unless the mistrial was compelled by manifest necessity." *United States v. Crotwell*, 896 F.2d 437, 439 (10th Cir. 1990); *see also United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824). The prosecution bears the burden of proving manifest necessity. *Walck v. Edmondson*, 472 F.3d 1227, 1236 (10th Cir. 2007). "[T]he Supreme Court has refused to adopt a mechanistic formula for the presence of manifest necessity, and has repeatedly reiterated that trial judges must be accorded broad discretion to declare a mistrial." *Id.* (quotations and citations omitted). The Tenth Circuit has adopted one commentator's set of twelve

factors relevant in determining manifest necessity. *Id.* n.5.[5]

The government argues, and this court agrees that the first factor—source of the difficulty—weighs heavily in favor of granting a mistrial. Defendant waited until the day before trial to file his Motion to Dismiss even though the factual circumstances surrounding the motion had been known for nearly two weeks. The late filing left little time to conduct a hearing prior to the start of trial. This court decided to pick and empanel the jury before conducting a hearing on the motion, rather than leaving the venire panel to sit and wait for the court to conduct business which should have been raised well before the eve of trial. After granting the motion, the government informed the court it would seek an immediate appeal from the court's suppression order and moved for a mistrial. Through no fault of its own, the government was helpless to avoid the double jeopardy consequences after this court granted the Motion to Suppress. Keeping in mind the paramount interests at stake under the manifest necessity standard—the defendant's interest in completion of the trial and the strength of the justification for a mistrial—this court granted a mistrial. *See Walck*,

---

[5]The twelve factors are:
(1) the source of the difficulty that led to the mistrial-i.e., whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or were events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated for the purpose of giving the prosecution an opportunity to strengthen its case; (3) whether the possible prejudice or other legal complications created by the difficulty could be "cured" by some alternative action that would preserve the fairness of the trial; (4) whether the record indicates that the trial judge considered such alternatives; (5) whether any conviction resulting from the trial would inevitably be subject to reversal on appeal; (6) whether the trial judge acted during the "heat of the trial confrontation"; (7) whether the trial judge's determination rests on an evaluation of the demeanor of the participants, the "atmosphere" of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence presented by the prosecution prior to the mistrial suggested a weakness in the prosecution's case (e.g., a witness had failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual.
5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 25.2(c) n. 18 (2d ed.1999).

472 F.3d at 1235-36; *see also Wade v. Hunter*, 336 U.S. 684, 689 (1949) ("[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."). Given the posture of the case it was not feasible to grant a trial continuance pending the resolution of the suppression appeal. *Contra United States v. Jorn*, 400 U.S. 470, 487 (1971) (holding district court abused its discretion by granting a mistrial without even considering a trial continuance). Therefore, the court decided that granting a mistrial was the most fair and just result under the circumstances.

To be clear, the court is not suggesting the defendant intentionally filed his motion late in order to adversely affect the proceedings. Nevertheless, under the circumstances, the late filing did result in prejudice to the government in its ability to retry the defendant on the current charges. Thus, defendant's late filing provides sufficient manifest necessity for granting the mistrial motion.

IT IS ACCORDINGLY ORDERED this 1st day of September, 2011, that defendant's Motion to Suppress (Dkt. No. 41) is granted.

IT IS FURTHER ORDERED that the government's oral motion for mistrial is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE